**PACIFIC FAR EAST LINE, Inc.,**
**Petitioner,**

v.

**UNITED STATES of America and Federal Maritime Board, Respondents,**

**City of Portland, Oregon, The Port of Seattle, and E. I. du Pont de Nemours and Company, Intervenors.**

No. 12995.

United States Court of Appeals
District of Columbia Circuit.

Argued May 17, 1957.

Decided June 20, 1957.

---

Messrs. Clifford J. Hynning and James K. Knudson, Washington, D. C., with whom Mr. Paul F. Sullivan, Washington D. C., was on the brief, for petitioner.

Mr. Edward Aptaker, Chief, Regulations Branch, Federal Maritime Board, with whom Messrs. Edward D. Ransom, Gen. Counsel, Federal Maritime Board, and Daniel M. Friedman, Atty., Dept. of Justice, were on the brief, for respondents. Mr. James L. Pimper, Asst. Gen. Counsel, Federal Maritime Board, also entered an appearance for respondent Federal Maritime Board.

Mr. Thomas J. White, of the bar of the Supreme Court of Oregon, Portland, Or., *pro hac vice,* by special leave of Court, with whom Mr. Alan F. Wohlstetter, Washington, D. C., was on the brief, for intervenors City of Portland, Or., and Port of Seattle.

Mr. Edwin B. Connolly, Wilmington, Del., was on the brief for intervenor E. I. du Pont de Nemours & Co. Mr. William E. Kirk, Jr., Washington, D. C., also entered an appearance for intervenor E. I. du Pont de Nemours & Co.

Before FAHY, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

This proceeding grows out of a complaint instituted before the Federal Maritime Board (hereinafter referred to as

the Board) by the ports of Portland, Oregon, and Seattle, Washington, pursuant to § 821 of the Shipping Act of 1916, as amended.[1] The complaint charged that the equalization practices of the Pacific Westbound Conference (hereinafter referred to as the Conference) and its members (petitioner is a member) were violative of §§ 15, 16 and 17 of the Shipping Act and of § 8 of the Merchant Marine Act of 1920, as amended.[2]

Rule 2 of the Conference defined "equalization" as the absorption by the carrier of the difference between the shipper's cost of delivery to ship's tackle at the terminal dock at the nearest Conference terminal port and the cost of delivery to ship's tackle at the terminal dock and port of the equalizing line. Thus, an individual Conference line was allowed to meet the competition of other member lines through equalizing the cost to a shipper of shipping through any Pacific Coast port.[3]

So far as is here challenged, the equalization practice arises by reason of the fact that, in the vicinity particularly involved here, a steamship company may, and often does, wish to avoid calls at the ports in Oregon and Washington, preferring to call only at California ports. Shippers in the Pacific Northwest who deliver their wares to California ports would presumably be repaid or refunded the difference between the cost of shipment to the ports in Washington or Oregon and the California ports in order to equalize costs to the shipper.[4]

The unjust discrimination alleged by the complainants before the Board was, in part, that equalization, as practiced, permits a large volume of traffic which would normally move through the complainants' ports to be diverted to California ports. This, it is claimed, results in less revenue to complainants and deprives complainants' ports of steamship service and frequent sailings which they would otherwise enjoy. Complainants

1. 46 U.S.C.A. §§ 801–842.

2. 46 U.S.C.A. §§ 861–889.

3. Article 4 of the basic agreement under which the Conference operates provides:
"There shall be no payment or refund in respect to freight or compensation received and no absorption at loading or discharging ports of rail or coastal steamer freights or other charges, directly or indirectly, by any of the parties hereto, except as may be agreed to by two-thirds of parties hereto at any regular meeting of the Conference."
Under this Article 4, Rule 2 [in force at the time of the filing of the complaint] read:
"Subject to Rules 3, 4 and 5, rates are based on direct loading at loading ports or docks but the individual Member Line Carrier may meet the competition of other Member Lines loading direct at Terminal Ports or Docks, either by transshipment or by equalization from point of origin.
"Except as may otherwise be agreed, nothing herein shall be construed to mean that a Carrier may meet the competition of other Member Lines by equalizing between Terminal Docks within a Terminal Port.
"Equalization is the absorption by the Carrier of the difference between Ship-

per's cost of delivery to ship's tackle at Terminal Dock at nearest Conference Terminal Port and the cost of delivery to ship's tackle at Terminal Dock and Port of equalizing line. Conference Terminal Ports and Docks are those named in Rule No. 3."
Rule 2 was later amended to read:
"Equalization shall only be applicable on the basis of carload or truckload rates, irrespective of quantity involved.
"Shippers must furnish carriers with copy of paid transportation bill (or certified copy of paid transportation bill) covering movement from point of origin.
"Prior to payment, all equalization bills must be submitted to the conference for approval and for confirmation of applicable interior rates and/or the amount of equalization."

4. In the record in this case, there is intimation that equalization on explosives by Pacific Far East Line may have resulted in over-payments to intervenor, du Pont, the shipper. The Board, however, in its report of July 12, 1956, stated that a separate proceeding would be commenced to determine whether the over-payments, if made, were in violation of the Act. Consequently, this matter is not before and has not been considered by the court.

also contend that the practice of equalization permits Conference lines to attract traffic to California ports from producing areas not geographically or naturally tributary to those ports.

After a hearing, the Board, on October 4, 1955, filed its report, holding that the equalization rule and practices of the Conference and its members, as applied to certain products, including explosives, were "unjustly discriminatory and unfair as between ports within the meaning of section 15 of the act and detrimental to the United States as contrary to the principles of section 8 of the Merchant Marine Act. * * *" Petitioner, as stated, is a member of the Conference.

An order dated October 4, 1955, was entered by the Board, directing that Article 4 of the agreement and Rule 2 of the Conference be disapproved insofar as they were found to be unjustly discriminatory and unfair as between ports, and directing that Article 4 and Rule 2 be amended in a manner consistent with the ruling. It was provided that equalization might be practiced out of a port only where adequate service is unavailable.

Petitioner thereupon filed in this court a petition for review and, thereafter, a motion for leave to adduce additional evidence, insofar as the adequacy of service involving explosives from said ports was concerned. The motion was granted and the cause remanded to the Board.

Further hearings were held and, thereafter, the Board filed a report dated July 12, 1956, and entered an order dated September 10, 1956, reaffirming its prior decision. By order dated November 13, 1956, the Board denied Pacific Far East Line's petition for reconsideration. An amended petition for review followed. By orders of this court, E. I. du Pont de Nemours and Company was allowed to intervene, and filed a brief urging reversal. The City of Portland, Oregon, and the Port of Seattle were also allowed to intervene, and filed a brief urging that the petition for review be dismissed.

The second order of the Board was to the effect that the equalization practice complained of was unjust and discriminatory, resulting, the Board found, in diversion of traffic which otherwise would naturally pass through the complaining ports. The Board held (1) that equalization as to explosives from du Pont, Washington, to the Philippine Islands had been justified on the basis of an inadequacy of scheduled direct steamship service from Puget Sound to the Philippines, and that such practice will continue to be justified until such time as approximately monthly sailings are available. The Board held (2) that direct service from Puget Sound to the Philippines, with a frequency of approximately one sailing a month, was adequate to meet the normal needs of shippers of explosives. The Board further held (3) that the Board had been formally advised that Java Pacific & Hoegh Lines would make calls approximately monthly at Blake Island (the explosive anchorage outside Seattle) when explosive cargo in any quantity is offered and, in such cases, Blake Island will be the last loading port prior to proceeding directly to Philippine Island ports of discharge. The Board then concluded that equalization on explosives from du Pont, Washington, to Philippine ports was no longer justified.

To protect the intervening shipper and any other similar shipper against the possibility that the monthly service might not adequately meet their needs on a particular shipment, the Board provided:

"[I]n the event a shipper is unable to obtain space for a specific shipment of explosives by a direct sailing from a terminal through which explosives would normally move at a date which reasonably will meet the needs of such shipper or his consignee, equalization shall be permitted on such shipment, Provided, that the shipper certifies to the Conference the need for space on such date and allows 48 hours after receipt of such certification for the Conference to name a conference carrier which will provide space on

a direct sailing which reasonably will meet the shipper's need."

■■ We hold that the Board's report and order of October 4, 1955, concerning the equalization practices of the Conference were, considering the record as a whole, supported by substantial evidence. We also hold that the report of July 12, 1956, and order of September 10, 1956, were similarly supported. The Board's orders, considering the amply supported findings, were consistent with the Shipping Act and the Merchant Marine Act, supra.

Section 15 of the Shipping Act, 46 U.S. C.A. § 814, requires common carriers by water to file with the Board a complete memorandum of agreements with other carriers fixing or regulating transportation charges, giving or receiving other special privileges, controlling, regulating, preventing or destroying competition, or touching upon similar matters. This section then provides:

"The commission may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations." [Emphasis supplied.]

By this section, a duty was conferred upon the Board to disapprove the Conference agreement concerning equalization if it found that practice to be unjustly discriminatory or unfair to ports, other entities or persons.

A procedure by which alleged violations of the Act may be brought before the Board is established by § 22 of the Shipping Act, 46 U.S.C.A. § 821. It is this section which gives the northwestern ports the right to file their complaints with the Board, and gives the Board the duty to pass upon the merits of the complaints.

Congress, by § 16 of the Shipping Act, 46 U.S.C.A. § 815, has, among other things, also provided:

"That it shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Section 17 of the Shipping Act, 46 U.S. C.A. § 816, asserts:

"No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the Federal Maritime Board finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge."

A further declaration of congressional policy which is pertinent is contained in § 8 of the Merchant Marine Act, 46 U.S. C.A. § 867, giving the Board the duty

"with the object of promoting, encouraging, and developing ports and transportation facilities in connection with water commerce over which it has jurisdiction, to investigate territorial regions and zones

tributary to such ports, taking into consideration the economies of transportation by rail, water, and highway and the natural direction of the flow of commerce; to investigate the causes of the congestion of commerce at ports and the remedies applicable thereto; to investigate the subject of water terminals, including the necessary docks, warehouses, apparatus, equipment, and appliances in connection therewith, with a view to devising and suggesting the types most appropriate for different locations and for the most expeditious and economical transfer or interchange of passengers or property between carriers by water and carriers by rail; to advise with communities regarding the appropriate location and plan of construction of wharves, piers, and water terminals; to investigate the practicability and advantages of harbor, river and port improvements in connection with foreign and coastwise trade; and to investigate any other matter that may tend to promote and encourage the use by vessels of ports adequate to care for the freight which would naturally pass through such ports * * * ."

While we need not decide that this section (conferring the power to investigate) confers power to act to promote ports, it is indicative of a congressional policy favoring port improvement and development. That policy having been expressed, the Board could, if it was not bound to do so, examine the practices here complained of in the light of that policy, and exercise its power to approve or disapprove such practices accordingly. The Board did consider this policy in determining whether or not to approve equalization as practiced by the Conference. We must therefore conclude that the Board's orders here under attack were authorized and supported by statute.

■ On the procedural aspect of the case, complaint is made that the Board committed error in basing its decision on assurances received from Java Pacific & Hoegh Lines after the conclusion of the hearing. The situation arose in this way:

The Board had found that monthly service would be adequate for du Pont's traffic in explosives and that "[t]he record is convincing that Java Pacific is ready, able and willing to commit its vessels to this service," i. e., from Puget Sound to Philippine Island ports of discharge. Petitioner urged, as the examiner had found, that direct service was non-existent and that Java Pacific had made no firm commitment to re-establish that direct service. Before the Board, petitioner also argued that the examiner erred in rejecting evidence to show that the Java Pacific service would be inadequate. Certainly the question of adequacy of service was peculiarly within the competency of the Board to resolve. United States Nav. Co. v. Cunard S.S. Co., 1932, 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408. We are satisfied that the record sustains the Board in its finding on this point.

Petitioner really bases its argument to us on the ground that the Board, after the record had been closed, had accepted and relied upon evidence which was received *ex parte*, to the effect that adequate monthly service would be supplied by Java Pacific. In weighing this claim, the total effect of what was done must be considered.

As to the willingness of Java Pacific to reinstitute its direct service, the Board had first found:

"We will ourselves ascertain whether or not Java Pacific will reinstitute its direct service, in spite of the fact that the evidence overwhelmingly indicates its intention to do so."

The Board added:

"No order will be entered at this time. The record will be held open for 30 days within which time we will expect Java Pacific to advise us

whether it has adjusted its sailings to provide Blake Island in Puget Sound as its last call on direct sailings to the Philippines."

Thus, since the Board had already found that monthly sailings would be sufficient, the only matter remaining open was whether Java Pacific would give written confirmation of another fact already found, i. e., that direct service would be reinstituted. To this end, the Board, on August 2, 1956, wrote to the representative of Java Pacific as follows:

"It is noted from your letter of July 31, 1956, that the Java Pacific and Hoegh Lines monthly Express Service presently leaving Vancouver, British Columbia, as the last port of loading on the Pacific Coast will make calls at Blake Island in Puget Sound when explosive cargo is offered and in such cases Blake Island will in effect be the last loading port prior to proceeding direct to Philippine Island ports of discharge.

"In the absence of any expressed limitation it is assumed that the Java Pacific and Hoegh Lines will make calls at Blake Island for any quantity of explosives.

"Your confirmation or correction of this assumption will be appreciated."

The agents for Java Pacific, on August 7, 1956, replied as follows:

"Reference is made to your letter dated August 2nd under the above file number [No. A17–15/Docket 723:070] relating to shipments of explosives from Blake Island Puget Sound, direct to Philippine Island ports of discharge.

"Your assumption as expressed in the second paragraph of your letter is quite correct as the Java Pacific & Hoegh Lines held themselves open to make calls at Blake Island for any quantity of explosives."

The record discloses that the evidence before the Board had already established that Java Pacific would provide monthly direct service. The letters added nothing to the record beyond committing Java Pacific formally to the course its agents had already promised. We do not see how petitioner or intervenor du Pont has been prejudiced.[5]

We have examined the other contentions urged by petitioner and intervenor du Pont and find no error. The orders on review will be affirmed.

Affirmed.

5. This is especially so in view of the concluding paragraph of the order of September 10, 1956, quoted on page 714 of 246 F.2d, supra. Under the Board's continuing jurisdiction, we have no doubt of its authority to take such steps as may be required in the event of future failure to meet the "shipper's need" in accordance with the representations upon which the order here was based. Included is the Board's power to permit a restoration of equalization under § 15.